## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20728

United States Court of Appeals
Fifth Circuit

**FILED**

September 29, 2017

Lyle W. Cayce
Clerk

MEGAN WINFREY,

Plaintiff – Appellee

v.

KEITH PIKETT, Former Fort Bend County Sheriff's Deputy,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY and ELROD, Circuit Judges, and RODRIGUEZ, District Judge.[*]

E. GRADY JOLLY, Circuit Judge:

Megan Winfrey brought this lawsuit under 42 U.S.C. § 1983 against Texas law enforcement officers, alleging that they violated her due process rights during a murder investigation. Relevant to this appeal, Megan alleges that Deputy Keith Pikett, a deputy sheriff and canine handler, conducted a dog-scent lineup—a peculiar lineup indeed—that ultimately resulted in her convictions for capital murder and conspiracy to commit capital murder—convictions since vacated by the Texas Court of Criminal Appeals. Pikett moved for summary judgment on the basis of qualified immunity. The district

---

[*] District Judge of the Western District of Texas, sitting by designation.

No. 16-20728

court denied Pikett's motion, and Pikett timely appealed. We DISMISS for lack of appellate jurisdiction because of material factual disputes concerning qualified immunity.

I.

This case originated when Murray Wayne Burr was found murdered in his home in San Jacinto County, Texas, in August 2004. The San Jacinto County Sheriff's Office and the Texas Rangers investigated the murder, focusing on three suspects: then-sixteen-year-old Megan Winfrey; her seventeen-year-old brother, Richard Winfrey, Jr. ("Junior"); and their father, Richard Winfrey, Sr. ("Senior").

Several weeks after the murder, Texas Ranger Grover Huff requested that Pikett, a deputy from a nearby law enforcement agency, assist the investigation by running scent lineups using two of his pet bloodhounds and scents from four suspects—Megan and Junior as well as Megan's boyfriend, Chris Hammond, and Hammond's friend, Adam Szarf. Pikett agreed and conducted the scent lineups, which were videotaped.

Before the scent lineups, Pikett asked the lead investigators to gather scents from the suspects and the victim. Huff asked each suspect to rub a piece of gauze on his or her skin. Each suspect placed the gauze in a plastic bag. Additionally, Huff rubbed a piece of gauze on Burr's clothing and put that in a separate plastic bag.

Pikett also had filler scents that he took from prisoners at the Fort Bend County Jail. He kept these scents in a duffle bag in the back of his SUV, which is also where he let his dogs ride daily. He reused filler scents multiple times—the ones used in the 2004 lineups were anywhere from one to two years old—instead of gathering new ones for each investigation. These scents were much older than the fresh scents from the suspects. Tracker dogs are more likely to follow fresher scents than older scents.

2

Later, Pikett met the investigators in a field.  He brought his dogs, unused paint cans, and filler scents.  Huff put a different suspect's scent or a filler scent in each paint can.  Then, he placed the cans in the field.  Pikett then gave one dog the victim's scent and waited to see if the dog "alerted" to any can.  After doing the lineup with the first dog, Pikett did it with another dog to confirm the result.  The cans stayed in the same position for each dog.  The dogs alerted on Megan's scent and Junior's scent as a match to the scent on Burr's clothes.

Pikett says that each bloodhound alerts in a different way and that he has been unable to train the dogs to alert in a specific manner.  He learns each dog's individual alert as he works with it.  If the dog alerts on a can, Pikett concludes that the can's scent matches the scent given to the dog.  No independent source ever tested or certified Pikett and his dogs.

More than two years after Pikett performed the scent lineups, Megan, Junior, and Senior were all arrested for Burr's murder.  Megan was indicted for capital murder during the course of robbery and conspiracy to commit capital murder.

Megan's case went to trial, where the scent lineups were a crucial part of the evidence used against her.  The lineups were the only evidence that purported to directly connect Megan to the crime scene.  Pikett testified that Megan likely had contact with the clothing Burr wore when he was murdered because the dogs alerted at Megan's scent sample.  Additionally, Pikett characterized Megan's contact with Burr's clothing as "significant," and he speculated that it was highly unlikely for that contact to be the result of anything other than direct contact close in time to the murder.  Based in no small part on the scent-lineup evidence, the jury convicted Megan on both counts of the indictment.

No. 16-20728

The Texas Ninth Court of Appeals in Beaumont affirmed Megan's convictions. *Winfrey v. State*, 338 S.W.3d 687, 689 (Tex. App. 2011). But in February 2013, the Texas Court of Criminal Appeals reversed and rendered acquittals on both counts, holding that the scent lineups and other corroborating evidence were legally insufficient to support a conviction of capital murder beyond a reasonable doubt or to sustain the agreement element of conspiracy. *Winfrey v. State*, 393 S.W.3d 763, 765, 772–74 (Tex. Crim. App. 2013).

Megan subsequently filed this § 1983 suit against Pikett and various other police investigators. She argues that Pikett violated her due process rights by knowingly using fabricated junk science, manipulating and falsifying the results of his dog-scent lineups, and employing an unduly suggestive lineup procedure that resulted in a faulty identification of Megan, which was used to secure her arrest warrant and wrongful conviction.

In November 2014, Pikett moved for summary judgment based on qualified immunity. In response, Megan submitted the videotape of the dog-scent lineups and a report by Steven Nicely, a police canine expert who watched the videotape of the lineups and reviewed Pikett's deposition. As stated by the district court, Nicely found that the lineups were flawed because:

> (a) newer scents stand out as fresher amongst older scents; (b) scents from people who live in the same place smell similar[]; (c) dogs can become accustomed to scents if they are exposed to them regularly; (d) Pikett's claim that his dogs are accurate ninety-nine percent of the time is unreliable; (e) Pikett may have influenced his dogs because he kept them on a short leash and could see in the cans; and (f) the dogs may have responded to deliberate cues from Pikett.

*Winfrey v. Pikett*, No. CV H-10-1896, 2016 WL 5817065, at *10 (S.D. Tex. Oct. 4, 2016). These flaws, Nicely concluded, showed that Deputy Pikett consciously influenced his dogs' behavior at or near the target cans. Nicely also

said that Pikett demonstrated that "he had no desire to protect someone from being falsely accused based on the use of Scent ID dogs" by not maintaining and recording results to establish the accuracy of his dogs.  Further, Nicely said that using multiple dogs to confirm the results did not matter because Pikett could see in the cans each time and the cans were not rearranged.

In October 2016, the district court denied Pikett's motion for summary judgment because Megan introduced enough evidence to create a question about whether Pikett recklessly or intentionally designed a flawed test.

Pikett timely appealed.  He contends that the district court erred in denying him qualified immunity because the scent lineups did not violate Megan's clearly established constitutional rights for two reasons.  First, he says the lineups were "accurate and not false testimony as alleged," given that they merely proved that Megan was in Burr's home approximately two weeks before the murder—a fact Megan admitted.  Second, he argues that two other recent Fifth Circuit cases addressing his dog-scent lineups indicate that he should have been granted immunity.  *See Curtis v. Anthony*, 710 F.3d 587 (5th Cir. 2013); *Winfrey v. San Jacinto Cty.*, 481 F. App'x 969 (5th Cir. 2012) (*Winfrey I*).

## II.

The district court's denial of summary judgment is immediately appealable "to the extent it turns on an issue of law." *Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 311 (1996)).  But this appeal is an interlocutory appeal, and we have no appellate jurisdiction to consider "the correctness of the plaintiff's version of the facts." *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985); *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).  It follows that this Court cannot review the district court's factual determination "that a *genuine* factual dispute exists," but it can review the district court's legal "determination that a particular

No. 16-20728

dispute is *material*." *Good*, 601 F.3d at 397–98. "An officer challenges materiality when he contends that 'taking *all* the plaintiff's factual allegations as true no violation of a clearly established right was shown.'" *Reyes v. City of Richmond*, 287 F.3d 346, 351 (5th Cir. 2002) (quoting *Cantu v. Rocha*, 77 F.3d 795, 803 (5th Cir. 1996)). The appealing defendant must therefore "be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal." *Good*, 601 F.3d at 398 (quoting *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007)). "Within this limited appellate jurisdiction, '[t]his court reviews a district court's denial of a motion for summary judgment on the basis of qualified immunity in a § 1983 suit de novo.'" *Id.* (alteration in original) (quoting *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009)).

"Summary judgment is required if the movant establishes that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citing Fed. R. Civ. P. 56(c)). Once an official asserts the defense of qualified immunity, the burden of proof shifts to the plaintiff, "who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* But all inferences are drawn in the plaintiff's favor. *Id.*

### III.

We begin and end by addressing whether we have appellate jurisdiction over Pikett's appeal.

Megan contends that we lack jurisdiction to hear Pikett's appeal because his argument hinges on factual disputes and does not address the legal issue of whether, based on the district court's findings and construing the facts in the light most favorable to Megan, the lower court erred as a matter of law. Pikett never touches this argument. Instead, he focuses on (1) Megan only

being able to establish the "known fact" that Megan was in Burr's house within a few weeks of the murder, which contradicts prior testimony that he gave and (2) this Court's holding in *Curtis v. Anthony*, which he interprets to mean that Pikett should have qualified immunity.

In any event, we hold that this Court lacks jurisdiction over Pikett's interlocutory appeal. Pikett, "despite giving lip service to the correct legal standard, . . . does not take the facts in a light most favorable to [Megan]." *Reyes*, 287 F.3d at 351. The parties dispute whether: (1) Megan admitted that she was in Burr's home roughly two weeks before Burr's murder; and (2) the scent lineups were properly conducted and thus informed investigators, prosecutors, and the jury that Megan was in direct contact with Burr's clothes shortly before his murder or merely that Megan had been in Burr's home at some point in time. Megan contends that she never admitted that she had been in Burr's home two weeks before the murder, and she says the scent lineups "falsely informed the investigators, prosecutors, and jury that [she] had been in direct contact with Burr's clothing, shortly before his murder." Pikett, however, contends that Megan admitted that she was in Burr's home roughly two weeks before his murder, and he says the scent lineups merely prove that Megan had been in Burr's home at some point in time.

In short, Pikett's argument hinges on these factual disputes being resolved in his favor. So his appeal boils down to a challenge of the genuineness, not the materiality, of factual disputes because he does not "contend[] that 'taking *all* [Megan]'s factual allegations as true[,] no violation of a clearly established right was shown.'" *Id.* (quoting *Cantu*, 77 F.3d at 803). We have no jurisdiction over such a challenge.

7

No. 16-20728

IV.

At this juncture, we lack appellate jurisdiction to decide whether Pikett's version of the facts is correct.  Accordingly, this interlocutory appeal is

DISMISSED.